UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

In Re: ) Bankruptcy Case No.
) 04-68795-aer12
BILL AND MARY OSBORNE, )
) MEMORANDUM OPINION
Debtors, )
)

This matter comes before the court on Northwest Farm Credit Services, FLCA's (Farm Credit) motion to dismiss. The matter has been heard and is now ripe for decision.

### Facts:

Debtors Bill Osborne (Bill) and Mary Jane Osborne (Mary Jane) own various parcels of farmland in and around Tulelake, California. Bill is a third generation farmer, who historically farmed with his father, James Osborne (James), who owned nearby land. In 1994, Debtors and James jointly (along with a family trust) refinanced several pre-existing loans with Farm Credit. Farm Credit took security in the farmland, certain equipment and fixtures. Over the years various crops were grown on the land.

PAGE 1 - MEMORANDUM OPINION

In the late, 1990s Debtors ran into financial troubles and filed a Chapter 11 bankruptcy in the Eastern District of California. Farm Credit was listed as a creditor. The case was later converted to Chapter 7 and Debtors received their discharge in August, 2000. Much of Debtors' farm machinery was either sold or otherwise disposed of in that case. Debtors' real property was abandoned by the Chapter 7 trustee.

In the early 2000s, Debtors suffered a lost mint crop when the Bureau of Reclamation shut off their water supply due to drought-like conditions. After the crop's loss, Debtors lacked operating capital and decided to lease the farmland, sometimes on a crop-share, sometimes on a cash, basis.

At some point, the Farm Credit loan went into default and foreclosure proceedings were commenced.

In March, 2003, Bill leased 155 irrigable acres to Woodman Farms, Inc. on a cash rent basis (the Woodman lease).[1] The lease terminates no later than November, 2008. Under the lease, Bill was to provide "pumps and power," and pay the real property taxes. Bill testified that he maintains the pumps and irrigation, and is on the leased property daily.

In 2003, Bill leased the balance of their farmland to Earl Schultz (the Schultz lease). The arrangement was originally on a cash basis. Bill testified that "it didn't turn out that way." Bill

---

[1] See, Farm Credit's Exhibit J.

PAGE 2 - MEMORANDUM OPINION

furnished labor and maintained the irrigation equipment.[2] During calendar year 2003, more than half of Debtors' gross income was derived from the Schultz and Woodman leases.

At some point the Schultz lease terminated. In April, 2004, Bill leased 340 acres to Gene Dunlea on a 25% lessor/75% lessee "share" basis, over a six year term (the Dunlea lease).[3] The crop at the time Debtors' current bankruptcy petition was filed was in alfalfa. Under the lease, Bill was to provide "pipe, mainline, pumps, property taxes, water fees, and electricity for irrigation," and was to "ensure all irrigation systems are inspected and in proper working order, at which time the lessee shall assume responsibility for operation and maintenance."[4] Bill testified however that he has maintained the irrigation pumps during the lease's term.

After an aborted Chapter 13 case, filed in September, 2004, Debtors filed the present Chapter 12 petition on November 8, 2004.[5] At the time the petition was filed, both the Woodman and Dunlea leases were extant.

---

[2] Bill also testified he furnished some labor to Woodman.

[3] See, Farm Credit's Exhibit K.

[4] The Dunlea lease also provided that "[i]n the event of a water shortage the lease amount shall be adjusted to a rate acceptable to both the lessor and the lessee. Likewise, the unknown change in power cost (2006) shall be worked out by the two parties at that time." Farm Credit's Exhibit K.

[5] James likewise filed a Chapter 12 petition the same day, which has subsequently been dismissed.

PAGE 3 - MEMORANDUM OPINION

In their bankruptcy schedules in this case, Debtors listed $555,223.51 in secured debt, listing the debt to Farm Credit at $480,500, which was also listed as the value of the collateral securing the claim. They also listed $1,221.95 in priority unsecured, and $31,229.20 in general unsecured debt, listing Farm Credit at $0.00 and as "disputed, unliquidated and contingent." They listed James as a co-debtor.

## Discussion:

Farm Credit attacks Debtors' eligibility for Chapter 12 relief. Chapter 12 eligibility is governed by § 11 U.S.C. § 109(f)[6] which provides that "[o]nly a family farmer with regular annual income may be a debtor under chapter 12 of this title."

"Family farmer" is defined, in pertinent part, in § 101(18)(A) as an:

> individual or individual and spouse engaged in a farming operation whose aggregate debts do not exceed $1,500,000 and not less than 80 percent of whose aggregate noncontingent, liquidated debts (excluding a debt for the principal residence of such individual or such individual and spouse unless such debt arises out of a farming operation), on the date the case is filed, arise out of a farming operation owned or operated by such individual or such individual and spouse, and such individual or such individual and spouse receive from such farming operation more than 50 percent of such individual's or such individual and spouse's gross income for the taxable year preceding the taxable year in which the case concerning such individual or such individual and spouse was filed.

---

[6] Unless otherwise noted, all subsequent statutory references are to Title 11 of the United States Code.

PAGE 4 - MEMORANDUM OPINION

Farm Credit argues Debtors exceed the $1,500,000 "aggregate debt" limit of § 101(18)(A). It points to its proof of claim filed for over $1,442,000, which, when combined with the other claims, puts Debtors over the limit. Debtors argue Farm Credit's claim is a "non recourse" claim as a result of their prior Chapter 7 discharge. As such, it is limited to the value of the farmland that serves as its collateral.[7]

The Ninth Circuit Court of Appeals has held, in the Chapter 13 context, that "eligibility should <u>normally</u> be determined by the debtor's originally filed schedules, checking only to see if the schedules were made in good faith." <u>Scovis v. Henrichsen</u> *(In re Scovis)*, 249 F.3d 975, 982 (9th Cir. 2001) (emphasis added). For this purpose, there does not appear to be any reason to distinguish between Chapter 13 and Chapter 12. Here, Debtors' schedules reflect their theory that Farm Credit's claim is limited to the value of its security.

> For purposes of determining whether a particular schedule was filed in good faith in making the calculation under Code § 109(e) [Chapter 13], the debtor's schedules do not dictate the outcome if it appears from other relevant facts, readily ascertained, that the amount of a scheduled claim is, as a matter of law, greater than the amount disclosed.

<u>In Re Cookus</u>, Case # 04-66814-fra13 (Bankr. D. Or. Dec. 30, 2004) (Alley, J.) (unpublished). Thus, the court must decide the extent

---

[7] Debtors also sought to apportion their joint and several liability between themselves and James to bring them below the debt limit. It appears the majority, if not unanimous rule, is that Debtors may not do so. See e.g., <u>In Re Walton</u>, 95 B.R. 514 (Bankr. S.D. Oh. 1988) (Ch. 12); <u>In Re Cronkleton</u>, 18 B.R. 792 (Bankr. S.D. Oh. 1982) (Ch. 13).

PAGE 5 - MEMORANDUM OPINION

to which non-recourse obligations are counted for eligibility purposes, as a matter of law.

In <u>Quintana v. Commissioner</u>, *(In Re Quintana)* 915 F.2d 513 (9th Cir. 1990), the Chapter 12 debtors made the same argument as the debtors advance here. There, the secured creditor (within a pre-petition foreclosure suit), waived any deficiency claim that might arise after a foreclosure sale of the real property collateral. The debtors then filed Chapter 12 before the sale. The court examined Idaho law, finding the creditor's waiver irrelevant until the sale, held the full amount of the creditor's claim (as opposed to the amount secured by the value of the real property collateral) was to be counted for eligibility purposes.

At first blush <u>Quintana</u> would appear to control. Almost eleven (11) years later, however, in <u>Scovis</u>, <u>supra</u>, the Ninth Circuit in reiterating that eligibility is determined on the date of petition, 249 F.3d at 981, held it permissible to import a

PAGE 6 - MEMORANDUM OPINION

§ 506(a),[8] as well as a § 522(f)(1),[9] analysis into an eligibility determination. Id. at 983-984.[10] The court recognized that §§ 506(a) and 522(f)(1), by their literal terms, speak to postpetition events (i.e claim allowance and lien avoidance). Nonetheless, it refused to elevate form over substance. Id.

Following the Scovis rationale, the importation of a § 506(a) valuation is appropriate in this case. See also, Cavaliere v. Sapir, 208 B.R. 784 (D. Conn. 1997). The only evidence that has been adduced as to the value of Farm Credit's collateral is Debtors'

---

[8] Section 506(a) provides:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

[9] Section 522(f)(1) provides in pertinent part:

> Notwithstanding any waiver of exemptions but subject to paragraph (3), the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien is--
>
> (A) a judicial lien ....

[10] In Scovis, the issue was whether undersecured debt, and unsecured debt created by lien avoidance, should be counted as unsecured debt for purposes of Chapter 13 eligibility.

PAGE 7 - MEMORANDUM OPINION

schedules, which value the property at $480,500. Thus, Farm Credit's secured claim, for eligibility purposes, is $480,500.

As to any "undersecured" portion (which would also be counted in the "aggregate" debt analysis), Farm Credit itself acknowledges any such claim is unenforceable because of Debtors' Chapter 7 discharge. Id. (citing § 502(b)(1)[11]).[12] Thus, by importation of §§ 506(a) and 502(b)(1) in the § 101(18) analysis, Debtors' aggregate debts are under the $1,500,000 threshold.

---

[11] Section 502(b)(1) provides:

> Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that--
>
> (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured.

[12] As stated by the Cavaliere court (in the Chapter 13 context):

> Much as courts have avoid[ed] the temptation to raise form over substance by incorporating § 506(a) determinations of secured status into the § 109(e) calculus, congressional intent seems little advanced by denying the benefits of Chapter 13 protection merely on the basis of a large quantity of unenforceable debt. Nor is this conclusion altered by the fact that the unenforceability of the debt arises by virtue of a prior Chapter 7 discharge.

208 B.R. at 787 (internal citations and quotations omitted).

Again, there appears to be no principled distinction between Chapter 12 and Chapter 13 eligibility when "importation" of §§ 506(a) and § 502(b)(1) is at issue.

PAGE 8 - MEMORANDUM OPINION

The decision in Quintana is distinguishable from this case in that there, the Court held that, under Idaho law, the creditor was entitled to the full amount of its claim until a foreclosure sale had actually occurred, and the amount of any deficiency might be determined, stating, "until the actual sale of the property,...the amount of the debt is the full $1,527,861.89 of adjudged indebtedness." 915 F.2d at 516. Here, the parties concede that Debtors had received their prior Chapter 7 discharge before the date of the filing of the petition, herein, rendering any unsecured portion of Farm Credit's claim unenforceable, hence, disallowed pursuant to § 502(b)(1).

Next, Farm Credit argues Debtors have not met the "farming operation"[13] requirement of § 101(18)(A), in that they were not engaged in farming operations nor did they derive at least 50% of their gross income in 2003[14] from farming operations.

In In Re Sugar Pine Ranch, 100 B.R. 28 (Bankr. D. Or. 1989), this court held that "farming operation" should be given a broad or liberal construction. Id. at 31. Further, "[c]ourts should look to the totality of the circumstances involved in the debtor's operation bearing in mind the remedial purposes behind Chapter 12." Id. In so doing, some of the factors to be considered are:

> 1. Whether the location of the operation would be considered a traditional farm;

---

[13] Under § 101(21), "'farming operation' includes farming, tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, and production of poultry or livestock products in an unmanufactured state."

[14] 2003 is the taxable year preceding the petition's taxable year.

PAGE 9 - MEMORANDUM OPINION

> 2. The nature of the enterprise at the location;
> 3. The type of product and its eventual market...;
> 4. The physical presence or absence of family members on the farm;
> 5. Ownership of traditional farm assets;
> 6. Whether the debtor is involved in the process of growing or developing crops or livestock; and
> 7. Perhaps the key factor is whether or not the practice or operation is subject to the inherent risks of farming.

Id. (internal citations and quotations omitted).

Here, applying the factors, the location of the operation is a traditional farm. The nature of the enterprise and type of product are the growing and harvesting of traditional crops. Bill was on the farm on a daily basis, maintaining the irrigation equipment and attending to other duties under the leases. True, debtors no longer own many traditional farm assets such as tractors, combines, balers etc., however, Bill, to a limited extent, contributed his labor to Woodman, and previously, to a greater extent, to Schultz. Finally, more than 340 acres are presently leased on a "share" basis under the Dunlea lease, where the lease payments are subject to the inherent risks of farming.

On balance, the court finds Debtors to be engaged in a farming operation, and further finds that they earned more than 50% of their gross income in 2003 from such operation.

Based on the above, Farm Credit's motion will be denied. An order consistent herewith shall be entered. The above constitutes

PAGE 10 - MEMORANDUM OPINION

the court's findings of fact and conclusions of law. They shall not be separately stated.

*Albert E. Radcliffe*
Albert E. Radcliffe
CHIEF BANKRUPTCY JUDGE

PAGE 11 - MEMORANDUM OPINION